UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| BRYAN CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | **FILED UNDER SEAL** |
| | ) | |
| CHEMWERTH, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | CIVIL ACTION |
| | ) | NO. 12-10446-MLW |
| CHEMWORTH, INC., | ) | |
| | ) | |
| Third-Party Plaintiff, | ) | |
| v. | ) | |
| | ) | |
| WALDMAN BIOMEDICAL | ) | |
| CONSULTANCY, INC. and | ) | |
| DR. ALAN A. WALDMAN, | ) | |
| | ) | |
| Third-Party Defendants. | ) | |

**MEMORANDUM OF DECISION AND ORDER ON
PLAINTIFF'S AND THIRD-PARTY DEFENDANTS'
MOTIONS TO EXCLUDE AND TO STRIKE TESTIMONY**

March 3, 2015

DEIN, U.S.M.J.

## I.  INTRODUCTION

This action arises out of an alleged oral agreement pursuant to which the plaintiff,

Bryan Corporation ("Bryan"), agreed to purchase the pharmaceutical ingredient

Tobramycin Sulfate ("TS") from the defendant, ChemWerth, Inc. ("ChemWerth").  Bryan

claims that in order to induce it to purchase TS from ChemWerth and to develop products

that could expand ChemWerth's TS market in the United States, ChemWerth falsely represented to Bryan that it would provide certain documents, including what is known as a Drug Master File ("DMF"), that were necessary for Bryan to obtain approval for its TS products from the United States Food and Drug Administration ("FDA"). By its claims against ChemWerth, Bryan is seeking to recover more than $2 million, which it claims to have lost seeking FDA approval of its TS products in reliance on ChemWerth's allegedly false promises.

ChemWerth denies that the parties entered into an enforceable agreement or that it misled Bryan about its ability to provide necessary documentation, and it has asserted various affirmative defenses and counterclaims in response to the plaintiff's claims. In addition, ChemWerth has brought a third-party complaint against Bryan's long-time consultant, Waldman Biomedical Consultancy, Inc., and its principal, Dr. Alan A. Waldman (collectively, "Waldman"). By its third-party claims, ChemWerth alleges that any damages Bryan suffered were caused by Waldman's failure to disclose relevant information to Bryan. It also alleges that Waldman made misrepresentations to ChemWerth, which resulted in damages to that party as well.

The parties have filed cross-motions for summary judgment (Docket Nos. 171, 173, 175, and 177), which are pending before the court. In connection with those motions, ChemWerth relies in part on the opinions of its expert, Peter E. Saxon. Waldman and Bryan have filed a "Motion to Exclude the Testimony of Peter E. Saxon" (Docket No. 162), seeking an order precluding ChemWerth's expert from rendering

expert opinions on eleven out of twelve topics listed in his Opening Expert Report. In opposition to this motion to exclude, ChemWerth has filed a declaration of Peter E. Saxon. In response, Waldman and Bryan have filed a "Motion to Strike the Declaration of Peter E. Saxon" (Docket No. 229).

For all the reasons detailed below, both the motion to exclude (Docket No. 162) and the motion to strike (Docket No. 229) are DENIED. However, the denial of Waldman's and Bryan's motion to exclude Mr. Saxon's testimony shall be WITHOUT PREJUDICE to renewal at the time of trial.

## II.  FACTUAL BACKGROUND

Peter E. Saxon is the founder and a principal of Saxon International Associates, a consulting company that assists manufacturers of Active Pharmaceutical Ingredients ("API") and finished dosage manufacturers in meeting regulatory requirements in the United States, Europe and Australia.  (See Waldman Ex. 1 ¶ 7; Waldman Ex. 2 at 1).[1]  He has also been accepted by the FDA as an expert consultant in Consent Decree remediation assistance, and has worked with four domestic pharmaceutical companies to remedy issues arising under their respective Consent Decrees with the FDA.  (Id.).  Prior to founding Saxon International Associates, Mr. Saxon worked for 23 years at the pharmaceutical company, Ciba-Geigy Corporation.  (Waldman Ex. 1 ¶ 11; Waldman Ex. 2 at 1-2).  While at Ciba-Geigy, Mr. Saxon held positions in various levels of

---

[1]  "Waldman Ex." refers to the exhibits attached to Waldman's and Bryan's Memorandum in Support of Their Motion to Exclude the Testimony of Peter E. Saxon (Docket No. 164).

management, including but not limited to, the Director and Technical Operations Coordinator for the United States, the United Kingdom and five other countries, and the General Manager of a joint venture between Ciba-Geigy and a pharmaceutical company known as Sandoz. (Waldman Ex. 1 ¶ 11). ChemWerth has retained Mr. Saxon to provide expert testimony on its behalf at trial. In addition, ChemWerth relies on Mr. Saxon's proposed testimony to support its arguments on summary judgment.

As described in detail in his Opening Expert Report, Mr. Saxon intends to provide testimony and render expert opinions relating to the nature and quality of the consulting services that Waldman provided to Bryan in connection with Bryan's TS project, Bryan's failed effort to obtain FDA approval of its TS project, and ChemWerth's claim that Waldman was responsible for all of Bryan's alleged losses. In particular, Mr. Saxon proposes to express opinions on twelve topics, which are described in his Report as follows:

> A.    Waldman does not have sufficient knowledge and experience to lead an injection drug development project, and he also does not possess sufficient regulatory knowledge as a regulatory expert in the field to guide the development and lead the regulatory filings of Bryan Corp.'s TS project.
>
> B.    Bryan Corp. assumed the risk that its TS project may not be successful by hiring Dr. Waldman and by not seeking an independent opinion on Waldman's performance.
>
> C.    Bryan Corp. submitted an insufficient exhibit batch size; they did not manufacture the required three [process validation batches] per dosage strength; they used a TS API lot with high bioburden outside acceptable limits to make the exhibit batches, in violation of FDA regulations, and they could not

have met the exhibit batch size requirement of FDA because Bryan Corp. did not order sufficient amount of TS API from ChemWerth.

D.      Waldman chose the wrong quality of API for use in developing Bryan Corp.'s TS drug products.

E.      Waldman's audit of Daxin was not up to FDA Standards and his conclusion about the acceptability of Daxin's products was ill founded.[2]

F.      Waldman made adulterated TS drug product in violation of US [current Good Manufacturing Practice ("cGMP")].

G.      Waldman mischaracterized the FDA's Refusal to File Letter.

H.      Bryan Corp.'s criminal record seriously affected its ability to obtain FDA's acceptance and approval of its TS [Abbreviated New Drug Application ("ANDA")].

I.      ChemWerth's plan for filing a TS DMF from alternative source is compliant with cGMP or FDA guidelines.

J.      It would be highly unlikely for ChemWerth to enter a contract in which [it] promised to provide a DMF for TS API in support of Bryan Corp.'s ANDA filing.

K.      All of the amounts totaling $2.1 million should be excluded from the alleged damages against ChemWerth because [Waldman's] incompetent services were the direct cause of the failed TS ANDA and [New Drug Application ("NDA")] projects.

L.      Bryan Corp. lacks bases to allege that ChemWerth be responsible for costs incurred on the TS projects before November 2006 and after July 2007.

---

[2] "Daxin" refers to Chongqing Daxin Company Limited, Inc., a Chinese manufacturer of TS with whom ChemWerth had a business relationship.

(Id. ¶ 2).  While Waldman and Bryan do not challenge the admissibility of topic E, they have moved for an order excluding the remaining topics from the record.  Specifically, Waldman and Bryan contend that Mr. Saxon is not qualified to opine on those topics because they concern NDAs and ANDAs, and Mr. Saxon lacks the knowledge, skill, experience, training or education to demonstrate expertise on those matters.  They also challenge the reliability and relevance of Mr. Saxon's proposed testimony.

In connection with its opposition to Waldman's and Bryan's motion to exclude, ChemWerth submitted the Declaration of Peter E. Saxon.  (Docket No. 194).  Therein, Mr. Saxon elaborates upon his qualifications as an expert witness by discussing his experience in the field of FDA regulatory compliance, and describing how his professional experience relates directly to NDAs and ANDAs.  Thus, Mr. Saxon's Declaration rebuts Waldman's and Bryan's assertion that Mr. Saxon lacks the expertise necessary to testify on issues involving NDAs and ANDAs, and supports ChemWerth's assertion that he is qualified to express the opinions listed in his Opening Expert Report.  Waldman and Bryan maintain that the Declaration is inconsistent with Mr. Saxon's deposition testimony, and must be stricken from the record.

Additional factual details relevant to this court's analysis are described below where appropriate.

## III.  DISCUSSION

### A.  Motion to Strike Mr. Saxon's Declaration

Waldman and Bryan have moved to strike Mr. Saxon's Declaration on the grounds that it contradicts the declarant's prior sworn deposition testimony. In particular, Waldman and Bryan take issue with Mr. Saxon's statement, set forth in paragraph 11 of his Declaration, that he has "reviewed and checked over 120 ANDAs and NDAs" during the course of his career. (<u>See</u> Saxon Decl. (Docket No. 194) ¶ 11). They contend that Mr. Saxon's description of the volume of ANDAs and NDAs that he has considered conflicts with his prior deposition testimony, in which he allegedly stated that "he had only ever 'seen,' 'looked at' or 'reviewed' five to ten ANDAs, and one NDA." (Waldman Mem. re Mot. to Strike (Docket No. 230) at 4). Because Mr. Saxon has proffered no explanation for the alleged change in his testimony, Waldman and Bryan are urging this court to strike his Declaration from the record. (<u>See id.</u> at 4-5). For the reasons that follow, this court declines to do so.

"It is well-established that 'a party opposing summary judgment may not manufacture a dispute of fact by contradicting his earlier sworn testimony without a satisfactory explanation of why the testimony is changed.'" <u>Hofer v. Gap, Inc.</u>, 516 F. Supp. 2d 161, 169 (D. Mass. 2007) (quoting <u>Abreu-Guzman v. Ford</u>, 241 F.3d 69, 74 (1st Cir. 2001)). However, this does not mean that a party opposing summary judgment is precluded from presenting additional testimony relating to topics covered in a prior deposition. An affiant is entitled to clarify or augment prior testimony without running afoul of the "sham affidavit rule." <u>Mahan v. Boston Water & Sewer Comm'n</u>, 179 F.R.D. 49, 53-55 (D. Mass. 1998). Therefore, an "affidavit should be stricken only if

there is a clear and unambiguous contradiction between the affidavit and the prior sworn testimony."  <u>Hofer</u>, 516 F. Supp. 2d at 169.  "A subsequent affidavit that merely explains, or amplifies upon, opaque testimony given in a previous deposition is entitled to consideration in opposition to a motion for summary judgment."  <u>Id.</u> (quoting <u>Gillen v. Fallon Ambulance Serv., Inc.</u>, 283 F.3d 11, 26 (1st Cir. 2002)).

The record in the instant case does not clearly establish the existence of a direct conflict between Mr. Saxon's Declaration and his prior sworn deposition testimony. Rather, as detailed herein, Waldman's and Bryan's arguments are based on too narrow a reading of Mr. Saxon's deposition testimony.  Contrary to Waldman's and Bryan's present contention, Mr. Saxon did not testify at his deposition that the extent of his experience was with 5-10 ANDAs and one NDA.  Rather, he testified that while he may have been tasked with formally reviewing only five to ten ANDAs and one NDA, virtually all of his experience involved working with ANDAs and NDAs.  Therefore, there is no clear conflict between his deposition testimony and his Declaration.

The record shows that during his deposition, Mr. Saxon was questioned about the number of stability and process validation batches ("PVBs") that must be submitted to the FDA as part of an ANDA.  (Waldman Ex. 3 at 50-55).  In the context of that discussion, Mr. Saxon testified that "*[a]side from the ANDAs and the NDAs that I've worked with*, I have had the opportunity or the requirement *to review* ANDAs and NDAs of companies as either part of the consent decree or as part of an audit."  (<u>Id.</u> at 55 (emphasis added)). He further explained that he has seen "somewhere between five and ten ANDAs over

[his] experience as a consultant[,]" and he stated that his opinion about the number of

batches that must be submitted to the FDA was "based on [his] *review* of five to ten out

of potentially thousands of ANDAs that have been filed with the FDA[.]" (Id. at 56-57

(emphasis added)). However, Mr. Saxon was not asked to explain what he meant by the

ANDAs and NDAs that he had "worked with," versus those that he had "reviewed." Nor

was he asked to elaborate on testimony that he had given earlier in his deposition, in

which he stated that "every API that I work with is . . . part of an ANDA." (ChemWerth

Ex. G at 38).[3] Those statements establish that Mr. Saxon was using "review" as a term of

art to refer to a specific type of work that he has performed, and not in a broader sense to

encompass all ANDAs and NDAs that he has worked with in some fashion. His

testimony also indicates that he was confining his answer to the specific question to

ANDAs that he had "reviewed," and that he did not mean to suggest that he had only ever

seen or looked at five to ten ANDAs over the course of his entire career.

   This court's view that Mr. Saxon was using the term "review" narrowly is sup-

ported by additional testimony that the witness gave later in his deposition. In particular,

Mr. Saxon was asked to confirm that he has "reviewed" only five to ten ANDA applica-

tions. (Waldman Ex. 3 at 156). During the ensuing discussion, Mr. Saxon drew a

distinction between a review of an ANDA for submission to the FDA and a review of an

---

[3] ChemWerth's exhibits are attached to the Declaration of Bojuan Deng in Support of
ChemWerth's Opposition to Waldman and Bryan Corp.'s Motion to Exclude the Testimony of
Peter E. Saxon (Docket No. 195).

ANDA for purposes of a due diligence audit, and indicated that he has "reviewed" additional applications as part of his work performing due diligence audits. (See id. at 156-57). Viewing his deposition testimony as a whole, Mr. Saxon testified that he had experience with numerous ANDAs and NDAs in various capacities throughout his career. Viewed in context, therefore, Mr. Saxon's deposition testimony is consistent with his Declaration wherein he stated that he has "reviewed and checked over 120 ANDAs and NDAs" in connection with his experience in the pharmaceutical industry, and that this estimate includes

> 5-10 ANDAs which have been "reviewed for file," 5-10 ANDAs which have been "reviewed for accuracy" during due diligence audit, checking between 55 and 65 ANDAs and NDAs during the course of my ordinary audits, and checking approximately 50 more ANDAs and NDAs during my work as a qualified expert consultant for Consent Decree remediation.

(Saxon Decl. ¶ 11). Neither in his deposition nor in his Declaration did Mr. Saxon indicate that he had only limited familiarity with ANDAs and NDAs so as to negate his qualification to render his expert opinions. At best, Mr. Saxon's deposition is ambiguous as to the actual number of ANDAs and NDAs with which he has worked.

Waldman and Bryan point out that toward the end of his deposition, Mr. Saxon answered "Right" when asked to confirm his testimony that he had "looked at five to ten ANDAs[.]" (Walman Mem. re Mot. to Strike at 3). However, when viewed in the context of his earlier testimony, this statement does not establish that Mr. Saxon only ever saw or looked at five to ten such applications. Rather, it indicates that Mr. Saxon

was affirming his prior descriptions of his experience. Consequently, this court concludes the record does not establish "a clear and unambiguous contradiction between the [Declaration] and [Mr. Saxon's] prior sworn testimony." Hofer, 516 F. Supp. 2d at 169.

As explained more fully in the Declaration, Mr. Saxon has extensive experience in the pharmaceutical industry, much of which required him to be familiar with ANDAs and NDAs. For example, but without limitation, Mr. Saxon explains that he has supervised over 142 DMF filings on behalf of API manufacturers since 1993, and that he serves as the FDA's principal contact for any technical issue that may arise with respect to any of the 61 active DMFs that remain on file with the FDA. (Saxon Decl. ¶ 22). According to Mr. Saxon, "[e]very DMF for an API" with which he has worked "is part of an ANDA." (Id. ¶ 24). In addition, but again without limitation, Mr. Saxon states that as an FDA accepted consultant for Consent Decree remediation assistance, he has assisted four major U.S. pharmaceutical companies to correct cGMP deficiencies and/or regulatory violations relating primarily to NDA and ANDA products. (Id. ¶¶ 28-30). He further estimates that he has "worked on over 50 NDA and ANDA drug products" in his capacity as a consultant for Consent Decree remediation. (Id. ¶ 31). Thus, although Mr. Saxon's work may have focused on specific aspects of the FDA approval process, or on particular issues of regulatory non-compliance, his Declaration establishes that he is familiar with, and has performed extensive work that is related to, NDAs and ANDAs. Waldman and

Bryan have not pointed to any direct inconsistencies between these aspects of Mr.

Saxon's Declaration and his earlier deposition testimony.

Finally, the fact that Mr. Saxon did not use the specific terms "ANDA" and

"NDA" in his curriculum vitae ("c.v."), or in a list of "Recognitions in the Industry" that

accompanied his Opening Expert Report, does not compel the conclusion that Mr. Saxon

had only limited experience with ANDAs and NDAs.  (See Waldman Mem. re Mot. to

Strike at 2).  To the contrary, Mr. Saxon's c.v. indicates that he has had significant

experience working with ANDAs and/or NDAs.  For instance, Mr. Saxon's c.v. shows

that he has prepared "over 200 Drug Master Files for foreign API manufacturers in

Europe, P.R. China, Taiwan and India."  (Waldman Ex. 2 at 1).  As Mr. Saxon stated

during his deposition, "every API" that he has worked with is "part of an ANDA."

(ChemWerth Ex. G at 38).  He also explained in his Declaration that "[a]ll of [his] DMF

work involves ANDAs or NDAs as no company would file a DMF without the

anticipation of an FDA application."  (Saxon Decl. ¶ 9).  Accordingly, Mr. Saxon's c.v.

indicates that he has had an extensive amount of experience working with ANDAs and

NDAs, and undermines Waldman's and Bryan's narrow reading of his deposition

testimony.  The  motion to strike is therefore denied, and this court will consider Mr.

Saxon's Declaration in connection with the pending motion to exclude Mr. Saxon's

expert testimony.

### B.    Motion to Exclude Mr. Saxon's Testimony

Having determined that Mr. Saxon's Declaration is properly before the court, this court turns to Waldman's and Bryan's motion to exclude Mr. Saxon's expert opinions. "The touchstone for the admission of expert testimony in federal court litigation is Federal Rule of Evidence 702." Crowe v. Marchand, 506 F.3d 13, 17 (1st Cir. 2007). That Rule provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. "The purpose of these requirements is to 'ensure, as a condition of admissibility, that proffered expert testimony rests on a sufficiently trustworthy foundation.'" First Marblehead Corp. v. House, 541 F.3d 36, 41 (1st Cir. 2008) (quoting Crowe, 506 F.3d at 17). The district court has broad discretion to determine the admissibility of expert witness testimony. See Crowe, 506 F.3d at 16 (explaining that district courts have "substantial latitude in the admission or exclusion of opinion evidence"). This court finds that there is no reason to strike Mr. Saxon's expert testimony at this stage of the litigation.

## Challenge to Mr. Saxon's Qualifications

Waldman and Bryan argue that Mr. Saxon's testimony should be excluded from the record because all eleven of his challenged opinions focus on ANDAs and NDAs, and Mr. Saxon lacks the qualifications necessary to testify on those matters. (See Waldman Mem. re Mot. to Exclude (Docket No. 164) at 4-6). For the reasons articulated above, these arguments are not persuasive. Moreover, the law does not require "that experts be 'blue-ribbon practitioners' with optimal qualifications." United States v. Vargas, 471 F.3d 255, 262 (1st Cir. 2006) (quoting United States v. Mahone, 453 F.3d 68, 71 (1st Cir. 2006)). Mr. Saxon's Declaration provides more than enough evidence to establish that ChemWerth's expert has the knowledge and experience necessary to render expert opinions on matters relating to NDAs and ANDAs. See In re Flonase Antitrust Litig., 907 F. Supp. 2d 637, 642-43 (E.D. Pa. 2012) (finding that former FDA Commissioner was qualified to offer opinions regarding FDA's ANDA approval process even though he never personally reviewed any ANDAs).

Waldman and Bryan also challenge Mr. Saxon's ability to testify on specific issues addressed in his expert report. In particular, they contend that Mr. Saxon is not qualified to opine on Waldman's ability to lead an injection drug development project because "the uncontroverted evidence in this case demonstrates that Waldman's ANDA and NDA experience far surpasses that of Mr. Saxon." (Waldman Mem. re Mot. to Exclude at 7). They also argue that Mr. Saxon is not qualified to render an opinion regarding Waldman's alleged mischaracterization of an FDA Refusal to File Letter that was issued

to Bryan, or to testify regarding the impact that Bryan's criminal record may have had on its ability to obtain FDA approval of its TS ANDA, because Mr. Saxon admitted during deposition that he had never seen any Refusals to File from the FDA prior to his review of the one at issue in this case, and conceded that he was not in a position to state what the FDA ultimately would or would not do as a result Bryan's conviction. (Id. at 8-9). Similarly, Waldman and Bryan contend that the court should strike Mr. Saxon's opinion that ChemWerth's plan for filing a TS DMF from an alternative source was compliant with cGMP or FDA guidelines because "he does not have any experience using an alternative source during the ANDA/NDA process, let alone receiving FDA approval of an ANDA or NDA after changing the API manufacturer." (Id. at 9). However, the record establishes that Mr. Saxon has had over 40 years of experience in the FDA regulatory compliance field, and has "been directly dealing with and addressing the concerns of drug manufacturers who file ANDAs and NDAs for many years." (Saxon Decl. ¶¶ 6-7). Assuming, arguendo, that the court ultimately allows testimony on all of these subjects at trial,[4] Waldman's and Bryan's arguments on these matters go to the weight of his testi-mony rather than its admissibility. Fraser & Wise, P.C. v. Primarily Primates, Inc., 966 F. Supp. 63, 69 (D. Mass. 1996) (explaining that once the court determines that a witness has sufficient knowledge to qualify as an expert, "challenges to the expert's skill or

_____

[4] Although this court finds that Mr. Saxon's testimony should not be excluded at this stage of the proceedings, nothing herein shall be deemed to have established the admissibility of such testimony at trial.

knowledge go to the weight to be accorded the expert testimony rather than to its admissibility" (citation omitted)).  ChemWerth's opponents will have ample opportunity both to challenge the relevance of such opinions and to attack the persuasiveness of Mr. Saxon's testimony by way of cross-examination at trial.

### Challenge to the Reliability of Mr. Saxon's Testimony

Waldman's and Bryan's next challenge concerns the reliability of Mr. Saxon's proffered opinions.  In particular, they argue that "there are no indicia of reliability, because Mr. Saxon lacks any ANDA and/or NDA education or training and he lacks any meaningful experience with ANDAs and NDAs."  (Waldman Mem. re Mot. to Exclude at 10).  For the reasons described previously, this argument lacks merit.  Consequently, this court declines to exclude Mr. Saxon's testimony on this basis.

The moving parties also contend that Mr. Saxon's opinions "have the hallmarks of being unreliable" because they have not been subjected to a peer review or other verification process.  (Id. at 11).  Again this court disagrees.  In Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993), the Supreme Court set forth a list of factors that courts may consider in evaluating the reliability of expert testimony, including "the verifiability of the expert's theory or technique, the error rate inherent therein, whether the theory or technique has been published and/or subjected to peer review, and its level of acceptance within the scientific community."  Ruiz-Troche v. Pepsi Cola of P.R. Bottling Co., 161 F.3d 77, 80-81 (1st Cir. 1998).  However, these factors "are not definitive or exhaustive, and the trial judge enjoys broad latitude to use

other factors to evaluate reliability."  United States v. Mooney, 315 F.3d 54, 62 (1st Cir.

2002).  Furthermore, the First Circuit has cautioned that

> [*v*]*oir dire* is an extremely helpful device in evaluating proffered
> expert testimony, and this device is not readily available in the
> course of summary judgment proceedings.  Moreover, given the
> complex factual inquiry required by *Daubert*, courts will be hard-
> pressed in all but the most clearcut cases to gauge the reliability of
> expert proof on a truncated record.  Because the summary judgment
> process does not conform well to the discipline that *Daubert*
> imposes, the *Daubert* regime should be employed only with great
> care and circumspection at the summary judgment stage.

Cortes-Irizarry v. Corporacion Insular de Seguros, 111 F.3d 184, 188 (1st Cir. 1997)

(internal citation omitted).  In the instant case, Waldman and Bryan have not shown that

it would be appropriate to exclude Mr. Saxon's testimony without at least "affording

[ChemWerth] adequate opportunity to defend its admissibility" through voir dire or in the

context of a trial setting.  See id.

Challenge to the Reliability of Topic C

As described above, Mr. Saxon opines, in topic C of his Opening Expert Report,

that Bryan

> submitted an insufficient batch size [to the FDA]; they did not
> manufacture the required three PVBs per dosage strength; they used
> a TS API lot with high bioburden outside acceptable limits to make
> the exhibit batches, in violation of FDA regulations, and they could
> not have met the exhibit batch size requirement of FDA because
> Bryan Corp. did not order sufficient amount of TS API from
> ChemWerth.

(Waldman Ex. 1 ¶ 2). Waldman and Bryan argue that this opinion is inadmissible because it is "based on unreliable principles and methods." (Waldman Mem. re Mot. to Exclude at 11).

To the extent Waldman's and Bryan's argument is premised upon Mr. Saxon's alleged lack of experience with ANDAs (see id. at 12), it is unpersuasive for the reasons discussed previously. This court is also unpersuaded by Waldman's and Bryan's assertion that this opinion is unreliable because Mr. Saxon did not present any written authority for his view of the number and size of the required validation batches. (See id. at 12-13). As described in his expert report, Mr. Saxon relied on an FDA letter dated August 4, 1993, and FDA Procedure Guide 22-90 to support his opinion. (See Waldman Ex. 1 ¶¶ 92-94, 260). In addition, Mr. Saxon appropriately relied on his experience with the FDA and the pharmaceutical industry to support his claim regarding the required number of PVBs per dosage strength. See In re Flonase Antitrust Litig., 907 F. Supp. 2d at 645 (finding that expert's testimony satisfied reliability requirement of Daubert analysis where expert "relied on his own direct experience at the FDA to formulate his opinions about what moves the Agency to act"). In fact, Bryan's expert, Christopher Smith, agreed with Mr. Saxon that three PVBs is the standard typically used by individuals in the pharmaceutical industry. (See ChemWerth Ex. H at 150). Thus, the record contains sufficient indicia of reliability to support the admissibility of Mr. Saxon's opinion on these matters. See Daubert, 509 U.S. at 594, 113 S. Ct. at 2797 (noting that

-18-

"general acceptance" in the relevant professional community "can be an important factor in ruling particular evidence admissible").

<u>Challenge to the Reliability of Topic D</u>

ChemWerth's opponents also take issue with Mr. Saxon's opinion, set forth at topic D, that "Waldman [c]hose the [w]rong quality of API for use in developing Bryan Corp.'s TS drug products." (Waldman Mem. re Mot. to Exclude at 13). They contend that this opinion is based primarily upon Mr. Saxon's belief that the TS manufacturer, Daxin, lacked the necessary water quality to manufacture sterile API, and they insist that the opinion is unreliable because Mr. Saxon admitted that he never visited the Daxin facility where the TS was made, and had no personal knowledge regarding the water quality at the facility. (Id.). However, as Mr. Saxon explained in his expert report, the "fatal defect" in Bryan's TS NDA product was Waldman's choice of non-sterile, class CFN API rather than sterile, class CFS API. (See Waldman Ex. 1 ¶¶ 107-08). Similarly, according to Mr. Saxon, because "Waldman used . . . non-sterile API with no bioburden specifications for developing a sterile injectable TS formulation for ANDA submission, Waldman used the . . . TS API for an unintended use." (Id. ¶ 115). This "render[ed] the final TS injectable ANDA product adulterated according to FDA standards, and thus not approvable by the FDA." (Id.).

In support of his opinion that Waldman selected the wrong API, Mr. Saxon did emphasize the fact that class CFN TS API "is typically manufactured, isolated and purified using lower quality water, such as city tap water, and would potentially cause

bioburden contamination[.]" (Id. ¶ 113). However, there is no indication that personal

knowledge of the manufacturer's water quality was necessary before Mr. Saxon could

render his opinion. Rather, as described above, the critical factor underlying Mr. Saxon's

conclusion was Waldman's choice of a non-sterile product, and his failure to include

bioburden specifications and testing in Bryan's ANDA submission. (See id. ¶ 116 ("To

correct the issue with the API for the ANDA, Bryan Corp. must re-manufacture all of the

ANDA exhibit batches using either sterile TS (class CFS, sterile API) or class CFN (non

sterile API for sterile drug use by including bioburden specifications and testing)").

Therefore, Waldman and Bryan have not shown that topic D of his Opening Expert

Report is unreliable and should be stricken from the record.

Challenge to the Reliability of Topic F

Waldman's and Bryan's final assault on the reliability of Mr. Saxon's testimony

concerns topic F, in which Mr. Saxon opines that "Waldman made adulterated TS drug

product in violation of US cGMP." (Waldman Ex. 1 ¶ 2). Waldman and Bryan assert

that this opinion constitutes an inadmissible legal opinion because it is based upon Mr.

Saxon's interpretation of a federal statute. (Waldman Mem. re Mot. to Exclude at 14).

Although Mr. Saxon cites the statutory definition of an adulterated drug product, his

expert report shows that his opinion was derived from his knowledge of industry practice

and his analysis of the TS API that was manufactured at Daxin's facility in China. For

example, but without limitation, Mr. Saxon reviewed the Certificates of Analysis that

were provided with each lot of TS API and contained basic information about the purity

-20-

and sterility of the product.  (Waldman Ex. 1 ¶¶ 180-82).  He also considered the class of

API that was used for Bryan's TS projects, as well as the level of bioburden contamina-

tion in the exhibit batches referenced in the ANDA.  (See id. ¶¶ 185, 187-88).  In short,

the record belies any conclusion that Mr. Saxon was attempting to perform a legal

analysis or to render a legal opinion.   His testimony thus falls within the scope of

permissible expert opinion.  See Ji v. Bose Corp., 538 F. Supp. 2d 354, 359 (D. Mass.

2008) (distinguishing between "impermissible testimony about what the law is and

permissible expert testimony about standard industry practice").

Finally, Waldman and Bryan contend that topic F is inadmissible because Mr.

Saxon's opinion that Waldman made adulterated TS product was premised upon the

erroneous assumption that ChemWerth and the TS manufacturer, Daxin, never provided

PVBs of injectable grade TS to the plaintiff, and that Mr. Saxon conceded as much during

his deposition.  (Waldman Mem. re Mot. to Exclude at 14-15).  However, ChemWerth

disputes the opposing parties' assertion that Mr. Saxon's testimony was predicated upon a

faulty factual assumption, and challenges their claim that the record "unequivocally

demonstrates" Bryan's receipt of injectable grade TS.  (See id. at 14; ChemWerth Opp.

Mem. (Docket No. 195) at 18-19).  Accordingly, this court finds that it would not be

appropriate to exclude topic F at this stage in the proceedings.  See Larson v. Kempker,

414 F.3d 936, 941 (8th Cir. 2005) ("As a general rule, the factual basis of an expert

opinion goes to the credibility of the testimony, not the admissibility, and it is up to the

opposing party to examine the factual basis for the opinion in cross-examination"
(quotations and citations omitted)).

### Challenge to the Relevance of Mr. Saxon's Opinions

The moving parties next contend that the opinions expressed in topics B, J, K and L should be excluded because they go beyond the scope of Mr. Saxon's expertise, and will provide no assistance to the trier of fact. (Waldman Mem. re Mot. to Exclude at 15-17). Pursuant to Fed. R. Civ. P. 702, "expert testimony must be relevant . . . in the incremental sense that the expert's proposed opinion, if admitted, likely would assist the trier of fact to understand or determine a fact in issue." First Marblehead Corp., 541 F.3d at 42 (quoting Ruiz-Troche, 161 F.3d at 81). Although Waldman's and Bryan's challenge to some of these topics presents a closer question, this court finds that they should not be excluded in the absence of voir dire or an opportunity for ChemWerth to defend the opinions at trial.

In topic B, Mr. Saxon opines that Bryan "assumed the risk that its TS project may not be successful by hiring Dr. Waldman and by not seeking an independent opinion on Waldman's performance." (Waldman Ex. 1 ¶ 2). Waldman and Bryan argue that this statement improperly expresses a legal opinion, and will not assist the trier of fact because Mr. Saxon lacks the experience necessary to testify about matters relating to ANDA and NDA projects. (Waldman Mem. re Mot. to Exclude at 15). This court has already rejected the argument that Mr. Saxon is not qualified to testify about ANDAs and NDAs. Furthermore, this court does not agree that topic B constitutes a legal opinion.

When viewed in the context of his Opening Expert Report, Mr. Saxon's assertion that Bryan assumed the risk of failure by hiring Waldman relates to Waldman's qualifications to lead an injection drug development project. (See, e.g., Waldman Ex. 1 ¶¶ 22, 67-76). That is not a topic that falls within the knowledge of an ordinary juror. Therefore, it is an appropriate subject for expert testimony.

The next opinion at issue, which is set forth in topic J, provides that "[i]t would be highly unlikely for ChemWerth to enter [into an oral] contract in which [it] promised to provide a DMF for TS API in support of Bryan Corp.'s ANDA filing." (Waldman Ex. 1 ¶ 2). Waldman and Bryan argue that Mr. Saxon's testimony on this topic consists of nothing more than "pure speculation[,]" and they point to the expert's limited experience with ChemWerth prior to this litigation, as well as Mr. Saxon's admission that he knows nothing about ChemWerth's actual business practices on such matters, in support of their assertion that this opinion should be excluded. (Waldman Mem. re Mot. to Exclude at 16-17). This court finds that topic J should not be excluded at this stage in the proceedings.

In connection with his opinion regarding the likelihood that ChemWerth would have entered into an agreement to provide a DMF, Mr. Saxon describes the extensive work and significant cost that is ordinarily associated with the process of obtaining a DMF. (Waldman Ex. 1 ¶¶ 38-44, 292). He also explains that "[b]ecause of the significant investment needed for the process of obtaining a DMF, API manufacturers and suppliers typically do not begin the development work and DMF preparation or the

associated facilities installation without a [written] contract or some assurance that their investment will yield a profitable return." (Id. ¶ 45). Furthermore, Mr. Saxon asserts that ChemWerth would have required certain information that it never received from Waldman before it could prepare for the filing of a DMF. According to Mr. Saxon, that information would have included the specifications for the TS API at issue, and the anticipated use of the TS API for making injectable drug products. (Id. ¶¶ 297, 302). This court finds that Mr. Saxon's testimony on these matters is not within the knowledge of an ordinary juror, and would assist the trier of fact in understanding certain issues in dispute in this litigation. Therefore, this court finds that topic J should not be excluded at this juncture. To the extent Waldman and Bryan wish to attack Mr. Saxon's opinion as speculative, there is nothing precluding them from raising the issue again by way of a motion in limine or from challenging the opinion at trial by way of cross-examination.

Waldman and Bryan also contend that Mr. Saxon should be precluded from testifying on issues relating to damages, such as the opinions expressed in topics K and L of his Opening Expert Report, because "he is not an expert in allocating damages between parties in litigation, and . . . has no experience, training or education in the calculation and allocation of damages." (Waldman Mem. re Mot. to Exclude at 17). Topics K and L of Mr. Saxon's Report consist of the following opinions:

> K.    All of the amounts totaling $2.1 million should be excluded
>        from the alleged damages against ChemWerth because
>        [Waldman's] incompetent services were the direct cause of
>        the failed TS ANDA and NDA projects.

L.      Bryan Corp. lacks bases to allege that ChemWerth be
        responsible for costs incurred on the TS projects before
        November 2006 and after July 2007.

(Waldman Ex. 1 ¶ 2).  This court finds that Mr. Saxon is not attempting to calculate or

allocate damages.  He is merely seeking to show that Bryan's alleged damages were

caused by Waldman, and not by anything that ChemWerth did or failed to do with respect

to Bryan's TS project.

        As described in his Opening Expert Report, Mr. Saxon intends to link Bryan's

alleged losses to Waldman's "incompetent services."  (See id.).  In particular, he intends

to describe how Waldman's actions in connection with Bryan's TS project, and in the

preparation of associated regulatory filings, led to the FDA's rejection of Bryan's ANDA

application, and to the failure of the project as a whole.  (See id. ¶ 22).  However, Mr.

Saxon does not purport to have expertise on damages, and he is not seeking to render

opinions that would require such an expert.  Therefore, this court finds that there is no

basis for excluding topics K and L from the record at this stage in the litigation .

## IV.  CONCLUSION

        For all the reasons detailed herein, Waldman's and Bryan's "Motion to Exclude

the Testimony of Peter E. Saxon" (Docket No. 162) and "Motion to Strike the

Declaration of Peter E. Saxon" (Docket No. 229) are DENIED.  However, the denial of

the motion to exclude Mr. Saxon's testimony shall be WITHOUT PREJUDICE to

renewal at the time of trial.

_____/ s / Judith Gail Dein_____
Judith Gail Dein
U.S. Magistrate Judge